Emily **BAUM**, Administratrix of the Es-
tate of Floyd Brown, Deceased,
Plaintiff-Appellant,

v.

The **BALTIMORE & OHIO RAILROAD
COMPANY**, Defendant-Appellee.

No. 12257.

United States Court of Appeals
Seventh Circuit.

June 27, 1958.

Rehearing Denied July 29, 1958.

Justin Waitkus, Anthony J. Cefali, Gary, Ind., Sackett, Pyatt & Waitkus, Gary, Ind., of counsel, for appellant.

Charles G. Bomberger, Hammond, Ind., Richard F. Benne, Hammond, Ind., Bomberger, Wilson, Crites & Belshaw, Hammond, Ind., of counsel, for appellee.

Before DUFFY, Chief Judge, and FINNEGAN and PARKINSON, Circuit Judges.

PARKINSON, Circuit Judge.

This action under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. originated by complaint in the District Court charging the defendant with failure to provide Floyd Brown, the plaintiff's decedent, with a safe place

to work and to operate its trains in a careful and prudent manner on Saturday, September 12, 1953.

At the conclusion of the plaintiff's case the District Court, on written motion of the defendant, directed a verdict in its favor. Judgment was entered on the verdict and this appeal followed.

The facts for the most part are undisputed. The decedent had been hired by the defendant as a section gang laborer on September 1, 1953. At the time of his death he and some forty other section gang laborers were living in bunkhouses provided by the railroad. These bunkhouses, comprising "the camp", were situated alongside the defendant's main right-of-way in Porter County, Indiana. This right-of-way consisted of three sets of tracks: a west-bound track, an east-bound track and a switching or passing siding.

The camp was to the north of the right-of-way, nearest the passing siding. There was a cinder roadway running along the north side of the right-of-way leading to public crossovers some distance away to the east and west. There was no crossover from one side of the right-of-way to the other in the near vicinity of the camp.

Ordinarily these laborers, including plaintiff's decedent, worked only eight hours a day Monday through Friday. They did not work on Saturdays, Sundays or holidays. If there was an emergency on the right-of-way on a Saturday, Sunday or holiday any of the laborers who were in camp and available were subject to call but they were not required to remain in camp nor to be on call Saturdays or Sundays and they did not have to check out nor get permission from anyone to leave the camp.

About 4:30 A.M. on Saturday morning, September 12, 1953, the decedent asked the camp cook "for some meat scraps to go fishing." The cook gave him the meat scraps and he left. He seemed to be sober and in good health. He was then last seen alive walking south toward the tracks.

Decedent's body was discovered, lying mutilated, along the east-bound main track, by the engineer of Train No. 92 at approximately 11:42 A.M. that same day. The engineer, one Harry Marr, an employee of defendant for the past 37 years, said that when he was 300 feet east of the labor camp he first saw an undiscernible object that looked something like a collection of newspapers bundled up along the track. It also looked like "rags or sacks" and was approximately 200 feet ahead when he first saw it. When the engine reached the object the engineer could tell "that apparently a colored person had been run over". (Decedent was a negro.) The engineer further stated that his train "was not involved in any accident at any time."

The body was identified as that of decedent Floyd Brown. Defendant stipulated that if decedent were alive at the time he was run over by a train "it would indicate that that would be the cause of his death."

Plaintiff fixed the time of decedent's death at approximately 5:00 A.M. by her witness Coroner Johnson. Counsel for plaintiff asked him the following question on direct examination and he gave the answer below:

"Q. Mr. Johnson, from the body, as you found it, did you estimate the time of death of Floyd Brown? A. Yes, sir, I believe I did estimate from the time of the year, weather conditions, the dryness of blood at certain places. I estimated that he died at approximately five A.M., five o'clock in the morning."

Counsel for plaintiff interrogated him further and with some questions by the court it developed that the time of death could have varied somewhat. William Litchfield in his written statement introduced in evidence by the plaintiff fixed the time of death at six to eight hours before he arrived at the scene right after noon time.

Between the time decedent was last seen alive and the time his body was dis-

covered seven trains passed the camp site. Two of these trains were east bound. Upon learning of the accident the railroad had its personnel inspect the engines of both these trains for any evidence that either had been involved in an accident. No such evidence was found.

Defendant's motion for a directed verdict was on the following grounds:

"1. There is no evidence as to how, when, or where the decedent, Floyd Brown, came to his death.

"2. There is no evidence that at the time of his death Floyd Brown was performing any act connected with his employment by the defendant in interstate commerce or otherwise.

"3. There is no evidence that the death of Floyd Brown was caused by any act of negligence of the defendant, or by the operation of any engine or train of the defendant."

The court granted the motion for the reasons stated therein and held that the evidence established that plaintiff's decedent when on defendant's tracks was not working or doing anything even remotely connected with his employment; that he was there for his own purposes and pleasure; that there was no evidence as to how plaintiff's decedent met his death and no evidence of any negligence whatsoever on the part of the defendant which could have been the cause of his death, proximate or otherwise.

As Mr. Justice Brennan, delivering the opinion for the court, reported as Rogers v. Missouri Pacific Railroad Co., 1957, 352 U.S. 500, 506–507, 77 S. Ct. 443, 448, 1 L.Ed.2d 493, said:

"Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought. It does not matter that, from the evidence, the jury may also with reason, on grounds of probability, attribute the result to other causes, including the employee's contributory negligence. Judicial appraisal of the proofs to determine whether a jury question is presented is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that negligence of the employer played any part at all in the injury or death. Judges are to fix their sights primarily to make that appraisal and, if that test is met, are bound to find that a case for the jury is made out whether or not the evidence allows the jury a choice of other probabilities. The statute expressly imposes liability upon the employer to pay damages for injury or death due 'in whole or *in part*' to its negligence."

Decedent died on a Saturday which, for him, was not a work day. While it is true he was subject to call *if* an emergency arose and *if* he was available such was not the case here. Decedent was last seen alive embarking upon a fishing trip which had no connection with his employment by the defendant. While it is true the Act has not been limited in its application to actual labor it has not, that we are aware of, been extended to the point it will cover decedent in the present case. Decedent here had no need to go upon the railroad tracks for the defendant had provided a cinder walk way along the north side of the right-of-way. This walk way provided ample access to and from the camp and decedent having chose instead to walk upon the tracks his position becomes more that of a licensee than one pursuing his employment.

Plaintiff cites several cases to substantiate his point that decedent was within the scope of his employment. Bountiful Brick Co. v. Giles, 276 U.S. 154, 48 S.Ct. 221, 72 L.Ed. 507; Casso v. Pennsylvania Railroad Company, 3 Cir., 219 F.2d 303; Mostyn v. Delaware, L. and W. R. Co., 2 Cir., 160 F.2d 15; Virginian Ry. Co. v. Early, 4 Cir., 130 F.2d 548; Chicago, M., St. P. & P. R. Co. v. Kane, 9 Cir., 33 F.2d 866; Atlantic Coast Line R. Co. v. Meeks, 30 Tenn.

App. 520, 208 S.W.2d 355. A careful reading of these cases reveals that the employees were there either passing to or from where the work was to be done, crossing the tracks because their only exit was on the other side and they had to do so, or were doing something *necessarily incident* to their employment. They were certainly not going fishing on their day off and crossing the tracks when there was absolutely no necessity for so doing.

Of perhaps more importance is the fact that there is absolutely no evidence as to how Floyd Brown met his death. While we may assume Brown's body was run over by defendant's train or trains there is no showing that Brown was alive at the time. Plaintiff in her brief first suggests that the jury could infer decedent might have attempted to cross the tracks at 4:30 A.M. and *"was hit by a passing train"*. At a later point when speaking of the engineer of the 9:06 A.M. Train plaintiff states *"[p]erhaps it was his train who struck Brown"* and yet later still we have the argument, as to the 11:42 A.M. Train, that it *"is evident the jury could readily infer that train No. 92 was the 'death train' or the 'hit and run' train."*

A shoe was found underneath a tie plate and from this fact plaintiff again suggests a number of theories upon which to predicate negligence. Not only are these theories remote and speculative but they ignore the fact that there is no proof that the shoe was Brown's and moreover, Engineer Marr of Train No. 92 stated that as he passed the scene of the accident he saw a *pair* of shoes lying outside the east bound track.

Without further proof, and there is none, the jury is left to speculate as to just how Brown died. In oral argument before this court counsel for plaintiff, when pressed, stated it was his theory that Train No. 92 passing the camp at approximately 11:42 A.M. had struck and killed Brown. This was the train that he characterizes as the "death train." However, what little evidence there is would seem to indicate that this particular train was the only passing train that could not have killed decedent. The engineer states that after seeing rag or sack like bundles along the tracks he saw that a man had been run over and he further states that his train was not in any accident whatsoever. He distinctly speaks of the accident as having occurred before he reached the scene. Furthermore the time of death would seem to be well prior to the time this train passed.

Plaintiff contends that defendant was negligent in that it failed to keep a proper lookout for decedent, that it failed to give proper warning signals, and that it failed to keep the engines properly lighted at all times knowing "full well the position of the decedent and the work in which he was engaged and the place that he might be expected to be."

Here again there is a complete failure of proof. Plaintiff would have us submit the case to the jury on the theory that they, the jury, might infer the above allegations to be true. A search of the record discloses not one iota of evidence from which the jury could find or reasonably infer any failure to keep a proper lookout, sound warning signals or keep the engines properly lighted. In addition the proof shows that decedent was not engaged in any work when he died and unless the engineers of the passing trains where clairvoyant they would hardly know "full well" that decedent or anybody else would "be expected to be" on the main line of the railroad going fishing or for any legitimate reason at 4:30 in the morning.

Plaintiff here wished to present to the jury the fact that decedent's body was found on defendant's main line in a mutilated condition and then hoped that through speculation, guesswork and inference the jury would find that the defendant through its negligence somehow ran down and killed decedent. What plaintiff refers to as "positive evidence" amounts to nothing more than pure fantasy and contains even less substance than broth brewed from the bones of a starved pigeon. In short there is no proof, either evidentiary or from which

any reasonable inferences could be drawn, of any negligence of the defendant whatsoever which could have played a part, even in the slightest, in producing the death of Floyd Brown.

A jury may not be permitted to guess liability upon a record that is as completely devoid of all proof as is this one before us. Kansas City Southern Ry. Co. v. Jones, 1928, 276 U.S. 303, 48 S.Ct. 308, 72 L.Ed. 583; Moore v. Chesapeake & Ohio R. Co., 1951, 340 U.S. 573, 577, 71 S.Ct. 428, 95 L.Ed. 547; Milom v. New York Central R. Co., 7 Cir., 1957, 248 F. 2d 52, certiorari denied 355 U.S. 953, 78 S.Ct. 537, 2 L.Ed.2d 529.

 Without a doubt the District Court correctly directed a verdict for the defendant in this case.

The judgment is affirmed.